**STATE of Utah, Plaintiff and Respondent,**

v.

**Ted FRAMPTON, Defendant and Appellant.**

No. 20279.

Supreme Court of Utah.

April 9, 1987.

A.W. Lauritzen, Logan, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

Defendant Ted Frampton was charged with two counts of criminal simulation for violating U.C.A., 1953, § 76-6-518(1)(c), (d), a third degree felony ("Count 1"), and U.C.A., 1953, § 76-6-518(1)(b), a class B misdemeanor ("Count 2").[1] After a trial

---

1. U.C.A., 1953, § 76-6-518 (Repl.Vol. 8B, 1978 ed.):

 (1) A person is guilty of criminal simulation if, with intent to defraud another:

 (a) He makes or alters an object in whole or in part so that it appears to have value because of age, antiquity, rarity, source, or authorship that it does not have; or

 (b) He sells, passes, or otherwise utters an object so made or altered; or

 (c) He possesses an object so made or altered with intent to sell, pass, or otherwise utter it; or

 (d) He authenticates or certifies an object so made or altered as genuine or as different from what it is.

held on September 5, 1984, a jury returned a verdict finding defendant guilty on both counts. We find defendant's claims of error below without merit and therefore affirm his conviction.

I

In March 1983, defendant offered to sell several baseball gloves to Chris Larsen, the manager of Al's Sporting Goods in Logan, Utah. Defendant offered to sell the gloves for $50 each. The gloves bore the Wilson A2000 mark, and defendant represented that they were genuine Wilson gloves. Upon examining them, however, Larsen concluded that they were counterfeit and declined to buy any. When Larsen told defendant the gloves were counterfeit, defendant insisted they were genuine Wilson gloves.

A day or so later, Steve Hansen, an employee of Al's Sporting Goods, went to defendant's place of business and bought a baseball glove from defendant for $50. This glove also bore the Wilson A2000 mark, and defendant represented that it was a genuine Wilson glove. While at defendant's business, Hansen also observed a box filled with thirty-five to fifty additional gloves. According to Hansen and others, the glove he bought was not a genuine Wilson glove, but was an inferior imitation. Hansen's purchase was made under the supervision of the Logan City police, who were investigating defendant in response to a complaint by Wilson Sporting Goods.

As part of the police investigation, Larsen had a recorded telephone conversation with defendant, a transcript of which was admitted at trial. During the conversation, Larsen negotiated the purchase of eleven gloves at $40 each. Defendant told Larsen the gloves were Wilson A2000 gloves, which were made in Korea. Larsen responded that he had contacted Wilson Sporting Goods and had been told that all

A2000's were made in the United States. Furthermore, he told defendant that he could not get the gloves from Wilson for a similar price.

Also in March 1983, two advertisements appeared in local newspapers offering the A2000 glove for sale at defendant's place of business for $50 each.

On March 10, 1983, the Logan City police conducted a search of defendant's business. Pursuant to that search, police seized thirty-eight baseball gloves bearing the Wilson A2000 mark. A Wilson Sporting Goods representative examined the gloves and determined that they were counterfeit.

On October 18, 1983, defendant was tried on two counts of criminal simulation. Defendant was represented by counsel, and the trial resulted in a hung jury. Defense counsel subsequently withdrew from the case, and a new trial date was set for February 15, 1984. Defendant represented himself at his second trial. Partway through this trial, the judge recused himself and a mistrial was declared.

A third trial was held on September 5, 1984. On that morning, defendant informed the court he intended to represent himself. The court advised him that he had a constitutional right to defend himself and that he would be accorded "every courtesy along that line." Nevertheless, over defendant's objection, the court appointed a public defender as standby counsel for defendant.

During trial, the jury heard testimony from two other people who had purchased gloves from defendant in transactions unrelated to those for which he was charged. The purpose of this testimony was to establish that defendant had the necessary intent to commit the crimes charged. In this regard, defendant had told one of these witnesses that the gloves he was selling had been made in the United States. In response to a question on cross-examina-

(2) Criminal simulation is punishable as follows:

(a) If the value defrauded or intended to be defrauded is less than $100, the offense is a class B misdemeanor.

(b) If the value defrauded or intended to be defrauded exceeds $100 but is less than $1,000, the offense is a class A misdemeanor.

(c) If the value defrauded or intended to be defrauded exceeds $1,000 but is less than $2,500, the offense is a felony of the third degree.

(d) If the value defrauded or intended to be defrauded exceeds $2,500, the offense is a felony of the second degree.

tion, another witness testified he believed defendant knew the mitts were counterfeit.

## II

■ Defendant contends that his conviction should be overturned because he failed to knowingly and intelligently waive his right to counsel.[2] Since defendant expressly declined an offer of counsel by the trial judge, he has the burden of showing by a preponderance of the evidence that he did not so waive this right.[3] Defendant has failed to meet this burden.

■ Defendant's claim must be reviewed in light of his decision to proceed pro se. In *Faretta v. California*,[4] the United States Supreme Court noted that the sixth amendment to the United States Constitution, which gives criminal defendants the tools to put on a defense,[5] implicitly guarantees the right of a competent accused to represent himself, without counsel, in state criminal proceedings.[6] An accused's right to conduct his own defense must be respected and guarded by the courts in harmony with the right to assistance of counsel, also guaranteed by the sixth amendment.[7]

■ It has long been settled that the right to assistance of counsel is personal in nature and may be waived by a competent accused if the waiver is "knowingly and intelligently" made.[8] Such waiver must of course be voluntary.[9] It follows therefrom that an accused's decision to defend himself is a waiver of the right to assistance of counsel. However, it is the trial court's duty to determine if this waiver is a voluntary one which is knowingly and intelligently made.[10]

In making this determination, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' "[11] Generally, this information can only be elicited after penetrating questioning by the trial court. Therefore, a colloquy on the record between the court and the accused is the preferred method of ascertaining the validity of a waiver because it insures that defendants understand the risks of self-representation. Moreover, it is the most efficient means by which appeals may be limited.[12]

---

2. The sixth amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of counsel for his defence."

3. *Moore v. Michigan*, 355 U.S. 155, 161–62, 78 S.Ct. 191, 195, 2 L.Ed.2d 167 (1957); *State v. Hamilton*, 732 P.2d 505, 507 (Utah 1986) (per curiam).

4. 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

5. *Id.* at 818, 95 S.Ct. at 2532.

6. *Id.* at 834, 836, 95 S.Ct. at 2541. The right to represent oneself in a criminal proceeding is also guaranteed by Utah law. See *Hamilton*, 732 P.2d at 507; *See State v. Ruple*, 631 P.2d 874, 875 (Utah 1981); *State v. Dominguez*, 564 P.2d 768, 769 (Utah 1977); *State v. Wilson*, 563 P.2d 792, 793–94 (Utah 1977); *State v. Penderville*, 2 Utah 2d 281, 288, 272 P.2d 195, 199 (1954); Utah Const. art. I, § 12; U.C.A., 1953, § 77–1–6(1)(a) (Repl.Vol. 8C, 1982 ed.).

7. *See Faretta*, 422 U.S. at 834, 95 S.Ct. at 2540.

8. *Argersinger v. Hamlin*, 407 U.S. 25, 37, 92 S.Ct. 2006, 2012, 32 L.Ed.2d 530 (1972); *Ruple*, 631 P.2d at 875–76; *Wilson*, 563 P.2d at 793–94; *see Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Hamilton*, 732 P.2d at 507; *Dominguez*, 564 P.2d at 770.

9. *See, e.g., Dominguez*, 564 P.2d at 770.

10. *People v. Romero*, 694 P.2d 1256, 1264 (Colo. 1985) (en banc); *State v. Kolocotronis*, 73 Wash.2d 92, 101–02, 436 P.2d 774, 781 (1968); *see State v. Blazak*, 105 Ariz. 570, 571, 468 P.2d 929, 930 (1970); *Ruple*, 631 P.2d at 876; *Dominguez*, 564 P.2d at 770.

11. *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942); `Hamilton*, 732 P.2d at 507; *Ruple*, 631 P.2d at 876.

12. *City of Bellevue v. Acrey*, 103 Wash.2d 203, 211, 691 P.2d 957, 962 (1984) (en banc). As a guide, we quote from the Bench Book for United States District Court Judges, vol. 1 §§ 1.02–2 to –5 (Federal Judicial Center, 3d ed. 1986), which provides:

 An accused has a constitutional right to represent himself if he chooses to do so. A defendant's waiver of counsel must, however, be knowing and voluntary. This means that you must make clear on the record that the defendant is fully aware of the hazards that he faces and the disadvantages of self-representation.

 When a defendant states that he wishes to represent himself, you should therefore ask questions similar to the following:

Even absent such a colloquy, however, this Court will look at any evidence in the record which shows a defendant's actual awareness of the risks of proceeding pro se.[13] In this regard, whether a knowing and intelligent waiver has been made turns upon the particular facts and circumstances surrounding each case.[14]

Although a defendant's background is relevant to his ability to waive his right to counsel,[15] that background

> is not relevant to show whether a sensible, literate, and intelligent defendant possesses the necessary information to make a meaningful decision as to waiver of counsel. The fact that a defendant is well educated, can read, or has been on trial previously is not dispositive as to

whether he understood the relative advantages and disadvantages of self-representation in a particular situation.

In the absence of a colloquy, the record must somehow otherwise show that the defendant understood the seriousness of the charges and knew the possible maximum penalty. The record should also show that the defendant was aware of the existence of technical rules and that presenting a defense is not just a matter of telling one's story.[16]

In this case, the record clearly indicates that defendant knew he was entitled to appointed counsel if he could show that he was indigent. And though he failed to satisfy the circuit court of his inability to secure counsel, defendant was provided or retained counsel after having been bound

---

(a) Have you ever studied law?

(b) Have you ever represented yourself or any other defendant in a criminal action?

(c) You realize, do you not, that you are charged with these crimes: (Here state the crimes with which the defendant is charged.)

(d) You realize, do you not, that if you are found guilty of the crime charged in Count I, the court ... could sentence you to as much as _____ years in prison and fine you as much as $_____? (Then ask him a similar question with respect to each other crime with which he may be charged in the indictment or information.)

(e) You realize, do you not, that if you are found guilty of more than one of those crimes this court can order that the sentences be served consecutively, that is, one after another?

(f) You realize, do you not, that if you represent yourself, you are on your own? I cannot tell you how you should try your case or even advise you as to how to try your case.

(g) Are you familiar with the ... Rules of Evidence?

(h) You realize, do you not, that the ... Rules of Evidence govern what evidence may or may not be introduced at trial and, in representing yourself, you must abide by those rules?

(i) Are you familiar with the ... Rules of Criminal Procedure?

(j) You realize, do you not, that those rules govern the way in which a criminal action is tried in ... court?

(k) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions of yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony.

(l) (Then say to the defendant something to this effect): I must advise you that in my

opinion you would be far better defended by a trained lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself. You are not familiar with the law. You are not familiar with court procedure. You are not familiar with the Rules of Evidence. I would strongly urge you not to try to represent yourself.

(m) Now, in light of the penalty that you might suffer if you are found guilty and in light of all the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?

(n) Is your decision entirely voluntary on your part?

(o) If the answers to the two preceding questions are in the affirmative, you should then say something to the following effect: "I find that the defendant has knowingly and voluntarily waived his right to counsel. I will therefore permit him to represent himself."

(p) You should consider the appointment of standby counsel to assist the defendant and to replace him if the court should determine during trial that the defendant can no longer be permitted to represent himself.

**13.** *See Dominguez,* 564 P.2d at 770.

**14.** *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023; *see Ruple,* 631 P.2d at 876; *Dominguez,* 564 P.2d at 770; *Wilson,* 563 P.2d at 793–94.

**15.** *See Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023; *United States ex rel. Konigsberg v. Vincent,* 526 F.2d 131, 134 (2d Cir.1975), *cert. denied,* 426 U.S. 937, 96 S.Ct. 2652, 49 L.Ed.2d 388 (1976); *Acrey,* 691 P.2d at 962; *State v. Evans,* 125 Ariz. 401, 402, 610 P.2d 35, 36 (1980) (en banc).

**16.** *Acrey,* 691 P.2d at 962 (citation omitted).

over to district court. The value of counsel should have been apparent to defendant. His first trial on October 15, 1983 (where he was represented by counsel), resulted in a hung jury.

Subsequent to that first trial, defendant's attorney withdrew from the case. However, the record fails to indicate that defendant requested new counsel from Judge Christoffersen even though he knew he had a right to appointed counsel if he could not afford an attorney. Instead, defendant represented himself at his February 15, 1984 trial until Judge Christoffersen recused himself and declared a mistrial.

■ Prior to his third trial on September 5, 1984, defendant filed eighteen motions on his own behalf. In two of these motions, defendant asserted his right to assistance of counsel. However, defendant insisted on being represented by a non-member of the Bar.[17] It is well established that a criminal defendant has no constitutional right to have unlicensed or lay counsel represent him.[18] On the day of his third trial, defendant stated in chambers that he was going to exercise his right to defend himself and objected to the judge's decision to appoint standby counsel. He also refused to receive any help from the appointed counsel.[19]

■ Indeed, the record adequately supports the conclusion that defendant knowingly and intelligently waived the right to representation by counsel. Defendant had previously been to trial twice before on the same charge. During *voir dire*, the judge explained the charges in open court, including the maximum penalty defendant could face if found guilty on both counts. Furthermore, in order to determine whether the jury understood the implications of the law, defendant himself spoke to the jurors about the statute under which he was charged. Finally, the judge truly accorded defendant every courtesy by explaining applicable procedure and giving defendant extremely wide latitude in conducting his defense. Defendant knew he faced a felony charge and was aware of the penalty he could be subjected to if found guilty. He also knew that the judge insisted upon having counsel present. Therefore, we find defendant's claim that he did not knowingly and intelligently waive his right to assistance of counsel to be without merit.

■ Defendant's brief points to several instances during the trial where he feels he failed to adequately represent himself. However, "whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.' "[20]

### III

Defendant's next point is that section 76-6-518, under which he was convicted, is

---

17. Defendant stated he believed he could not receive "proper, fair, effective and conscientious representation from a licensed member of the bar." In this regard, we note that the Supreme Court in *Faretta v. California* explicitly stated that the right to proceed without counsel was particularly necessary because to force counsel on an unwilling defendant would lead an accused to "believe that the law contrives against him." *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2540.

18. *See United States v. Olson,* 576 F.2d 1267, 1270 (8th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978); *Hamilton,* 732 P.2d at 507; *State v. Hines,* 6 Utah 2d 126, 131, 307 P.2d 887, 891 (1957).

19. The fact that the trial court insisted upon appointing standby counsel must have imparted to defendant the seriousness of the charges pending against him.

20. *Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46. Defendant relies upon *Morgan v. Rhay,* 78 Wash.2d 116, 470 P.2d 180 (1970), for the proposition that he did not knowingly and intelligently waive his right to counsel since no inquiry was made regarding his ability to employ an attorney. However, that case has no place in this appeal. *Morgan* deals with the right to appointment of counsel—a different concept than the right to assistance of counsel. Since we have decided defendant properly waived this latter right, issues concerning the former right are immaterial in this case. As a practical matter, standby counsel was appointed at the expense of the state. Furthermore, in light of defendant's motion, *see supra* note 17, the judge clearly did not err by failing to ascertain why defendant did not desire that particular appointed counsel.

preempted by article I, section 8, clause 8 of the United States Constitution and legislation enacted thereunder.[21] Specifically, defendant apparently claims that Utah's criminal simulation statute is preempted by the Trademark (Lanham) Act of 1946.[22] The Lanham Act provides a national scheme for the registration of trademarks used in interstate commerce, while granting each registered trademark holder the exclusive right to determine the use of his or her mark by others.[23]

█ In response to defendant's claim, it seems clear that:

The Lanham Act does not preempt the states' ability to recognize and protect trademark rights. The purpose of the Act was to protect the public from confusing and deceptive trademarks and to provide security against misappropriation for trademark owners who have invested resources in presenting their products to the public and exploiting whatever good-will the merits of their products warrant.... The Supremacy Clause bars only state statutes or doc-

trine that would permit the sort of confusing or deceptive practices the draftsmen of the Lanham Act sought to prevent.[24]

Since the Lanham Act does not generally preempt all state trademark laws,[25] many of which contain penal provisions,[26] it follows that the Act does not automatically preempt section 76–6–518.[27]

█ Moreover, defendant's claim does not withstand conventional preemption analysis. In *State v. Vlacil*,[28] we followed the guidelines set forth by the United States Supreme Court for use in determining the validity of a state law attacked as violative of the Supremacy Clause:

1. a state regulation is preempted where an unambiguous congressional mandate exists to that effect;

2. preemption exists where the state regulation cannot be enforced without impairing federal superintendence of the field; and

3. preemption of the state regulation exists where it stands as an obstacle to

---

**21.** Article VI, clause 2 of the United States Constitution provides in part: "[T]he laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Article I, section 8, clause 8 provides that Congress has the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

Defendant in his brief claims that the federal government has exclusive authority over copyrights via the Lanham Act and the exclusive power to regulate commerce pursuant to the constitution. It is well settled that states may regulate certain aspects of interstate commerce. *Exotic Coins, Inc. v. Beacom*, 699 P.2d 930, 938 (Colo.1985) (en banc). Also, the Lanham Act does not cover copyrights, and this case in no way involves copyright law.

**22.** Trademark (Lanham) Act of 1946, ch. 540, 60 Stat. 427 (codified as amended 15 U.S.C. §§ 1051–1127 (1982 & Supp.1985)).

**23.** *Id.*

**24.** *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 n. 3, 373 (1st Cir.1980) (citation omitted), *repudiated on other grounds, Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5 (1st

Cir.1981), *rejected on other grounds, Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695 (5th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982); *see* S.Rep. No. 1333, 79th Cong., 2d Sess., *reprinted in* 1946 U.S.Code Cong.Serv. 1274, 1274, 1276–77.

**25.** All states provide for registration of trademarks. *See* J. McCarthy, Trademarks and Unfair Competition, § 22:5 (2d ed. 1984).

**26.** *See, e.g.*, Cal. Penal Code § 350 (West Supp. 1987).

**27.** Defendant relies on *Mendes v. New England Duplicating Co.*, 94 F.Supp. 558 (D.Mass.1950), *aff'd*, 190 F.2d 415 (1st Cir.1951), for the proposition that issues of federal trademark infringement are governed by federal law. Such reliance is misplaced. We believe that case, in pertinent part, merely stands for the proposition that the law to be applied in federal courts is the law that is the source of the right sued upon. In *Mendes*, the court was in essence determining the validity of the plaintiff's federal registration. *Id.* at 559.

**28.** 645 P.2d 677 (Utah 1982) (following *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)).

the accomplishment and execution of the full purposes of Congress.[29]

Application of these guidelines in light of the general presumption against finding preemption[30] convinces us that defendant's preemption claim is invalid. First, defendant has failed to demonstrate that the intent of Congress was to comprehensively control all aspects of the trademark field. And reliance on section 32(1) of the Lanham Act does not implicitly manifest such. That section in part sets forth the remedies for infringement of a "registered mark."[31] The Lanham Act defines a registered mark as including only those marks registered in the United States Patent and Trademark office.[32] Second, enforcement of our criminal simulation statute in no way interferes with enforcement of the federal trademark registration scheme; Wilson Sporting Goods remains free, if it is considered a registrant under the Lanham Act, to seek redress pursuant thereto.

The question thus becomes whether the Lanham Act is compromised by the Utah law. In other words, we must decide whether there is "any potential erosion of the federal plan by operation of the state law."[33] Resolution of this issue requires us to determine the specific purpose of the federal law. The Senate report accompanying the Lanham Act states:

The purpose underlying any trademark statute is twofold. One is to protect the public so it may be confident that ... it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.[34]

The Lanham Act itself sets forth a statement of intent in section 45:

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.[35]

At most, our criminal simulation statute merely augments the federal scheme by providing penal sanctions for passing counterfeit goods to which federally registered trademarks are attached. In no way does it "permit confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders."[36] Therefore, since U.C.A., 1953, § 76–6–518 (Repl.Vol. 8B, 1978 ed.) does not conflict with the operation of the Lanham Act, it is not precluded by it.[37]

IV

Defendant next contends that section 76–6–518 is vague and overbroad. Vagueness questions are essentially proce-

29. *Id.* at 680. In light of the test laid down in *Vlacil* and followed here today, defendant's claim that mere inconsistency between federal and state law acts to preempt the latter is without merit.

30. *Florida Lime & Avocado Growers, Inc.*, 373 U.S. at 142, 83 S.Ct. at 1217.

31. *See* Trademark (Lanham) Act of 1946, ch. 540, § 32(1), 60 Stat. 427, 437 (codified as amended 15 U.S.C. § 1114 (1982)).

32. Trademark (Lanham) Act of 1946, ch. 540, § 45, 60 Stat. 427, 444 (codified as amended 15 U.S.C. § 1127 (1982)).

33. *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir.1975).

34. S.Rep. No. 1333, 79th Cong., 2d Sess., *reprinted in* 1946 U.S.Code Cong.Serv. 1274, 1274.

35. *See supra* note 32.

36. *Mariniello,* 511 F.2d at 858 (citation omitted). If state law permitted deceptive trademarks to operate, "then the state law would, under the supremacy clause, be invalid." *Id.* (citation omitted).

37. *See Id.* at 859.

dural due process issues, i.e., whether the statute adequately notices the proscribed conduct.[38] In *State v. Theobald*,[39] we held that "[a] statute is not unconstitutionally vague if it is sufficiently explicit to inform the ordinary reader what conduct is prohibited." [40] Section 76–6–518 clearly indicates that it is a crime to sell or possess with intent to sell a counterfeited object. Authenticating or certifying such an object as genuine is also proscribed. Additionally, the State must prove beyond a reasonable doubt that such acts occur with the intent to defraud. Accordingly, since section 76–6–518 clearly indicates the conduct proscribed, it is not void for vagueness.

▮▮▮▮▮ Statutory overbreadth, on the other hand, is a substantive due process question which addresses the issue of whether "the statute in question is so broad that it may not only prohibit unprotected behavior but may also prohibit constitutionally protected activity as well." [41] Since neither the Utah nor the United States constitution protects acts made with the intent to defraud, defendant's argument that section 76–6–518 is unconstitutionally overbroad is without merit.

## V

Defendant's next point is that he should have been charged with selling goods under a counterfeit trademark [42] instead of being charged with violating the criminal simulation statute. Prior to his first trial, defendant, through his attorney, filed a letter with the court expressing his belief that he was being tried under the wrong statute. Subsequently, the trial court ruled in a memorandum decision that the two statutes (the criminal trademark statute and the criminal simulation statute) were distinguishable and that defendant was correctly charged under the criminal simulation statute (section 76–6–518).

▮▮▮▮▮ Although some courts have narrowly interpreted similar criminal simulation statutes as covering only unique chattels, such as antiques or paintings,[43] given the plain language of our statute, such a restricted reading is not warranted. Other courts have construed similar criminal simulation statutes in a broad fashion:

The criminal simulation statute is essentially a forgery statute which extends beyond the forgery of written documents and instruments. The New York criminal simulation statute substantially adopts a provision of the Model Penal Code of the American Law Institute which "is based on the judgment that the penal law may appropriately reach the fraudulent simulation of antique furniture, paintings, jewels *and other objects*" ... (Model Penal Code and Commentaries [American Law Institute], Part II, § 224.2 at 306–307.) The rationale applicable to this section is that "the existence of non-genuine objects undermines confidence in the genuine and thus constitutes a burden on this branch of commerce." (Model Penal Code and Commentaries [American Law Institute], Part II, § 224.2 at 307.)

This court finds that nothing in the language of the statute would bar the prosecution of a defendant who forges or alters a modern commercially manufactured product. On the contrary, it appears that the purpose of the statute, is to protect consumers.[44]

---

**38.** *See City of Everett v. Moore*, 37 Wash.App. 862, 863–64, 683 P.2d 617, 618 (1984).

**39.** 645 P.2d 50 (Utah 1982).

**40.** *Id.* at 51 (citation omitted).

**41.** *Moore*, 37 Wash.App. at 864, 683 P.2d at 618.

**42.** U.C.A., 1953, § 76–10–1003 (Repl.Vol. 8B, 1978 ed., Supp.1983) (amended 1984).

**43.** *See, e.g., State v. Rea*, 145 Ariz. 298, 300, 701 P.2d 6, 8 (Ariz.Ct.App.1985); *People v. James*, 79

Misc.2d 805, 361 N.Y.S.2d 255, 258 (N.Y.Crim. Ct.1974).

**44.** *People v. Hafif*, 128 Misc.2d 713, 491 N.Y.S.2d 226, 228 (N.Y.Crim.Ct.1985) (emphasis added). The New York Statute provides:

A person is guilty of criminal simulation when:

1. With intent to defraud, he makes or alters any object in such manner that it appears to have an antiquity, rarity, source or authorship which it does not in fact possess; or

Section 76–6–518 was designed to protect consumers and, like other consumer protection statutes (such as the Utah Consumer Credit Code), must be construed broadly.[45] Thus, we construe our statute as prescribing penalties for those who forge, alter, or possess modern commercially manufactured products.

■ In this case, defendant possessed (with intent to sell) baseball gloves which are undisputedly modern commercially manufactured products. These gloves were made so that they would appear to have value because of their source, and not only because they were made by Wilson Sporting Goods. Defendant represented that the mitts were genuine Wilson gloves. One of the A2000's promotional qualities exploited by Wilson was that A2000s, at least at the time of the charged offenses, were only made in the United States. Because defendant sold or possessed such goods, he was properly charged under the Criminal Simulation Statute.

Defendant next contends that when two statutes prohibit identical conduct but impose different penalties, the accused is entitled to be charged under the statute carrying the lesser punishment. Defendant claims he should have been charged under U.C.A., 1953, § 76–10–1003 (Repl.Vol. 8B, 1978 ed., Supp.1983) (amended 1984), which states:

> Every person who sells or keeps for sale any goods upon or to which any counterfeited trademark, trade name, or trade device has been affixed, after it has been filed in the office of the secretary of state, intending to represent the goods as the genuine goods of another, knowing it to be counterfeited, is guilty of a class B misdemeanor.

■ The statute is quite narrow since it only proscribes activities involving goods to which are attached forged or counterfeited trademarks registered under *Utah's* trademark registration act. There is no evidence in the record that Wilson Sporting Goods Company has registered its A2000 trademark pursuant to the Utah act. Accordingly, on the facts of this case, defendant could not have violated section 76–10–1003. Therefore, defendant's contention that he should have been charged under section 76–10–1003 is without merit.

Defendant finally contends that selling goods under a counterfeit trademark is a lesser included offense of criminal simulation and that therefore the jury should have been so charged. In *State v. Oldroyd*,[46] this Court discussed the standard used to determine whether a defendant's request for a lesser included offense instruction should be granted. The Court stated:

> [T]here must be some overlapping of the statutory elements of the offenses. If that overlapping exists and the evidence is ambiguous and susceptible to alternative interpretations, the trial court must give a lesser included offense instruction if any one of the alternative interpretations provides both a "rational basis for a verdict acquitting the defendant of the offense charged *and* convicting him of the included offense." [47]

Because there was no evidence at trial showing that Wilson's trademark used on its A2000 was filed pursuant to the Utah act as is required for a finding of guilt under section 76–10–1003, there was no evidence by which a jury could rationally convict defendant under that section. Therefore, this contention is without merit.

## VI

■ Defendant's next point is that there was insufficient evidence to support his conviction on Count 1. When reviewing such claims, this Court has stated:

2. With knowledge of its true character and with intent to defraud, he utters or possesses an object so simulated.
 Criminal simulation is a class A misdemeanor.
 N.Y.Penal Law § 170.45 (McKinney 1975).

45. *See* U.C.A., 1953, § 76–1–106 (Repl.Vol. 8 1978 ed.).

46. 685 P.2d 551 (Utah 1984).

47. *Id.* at 553–54 (footnote omitted) (emphasis in original).

We do not invade that prerogative and overturn the jury's verdict unless the admissible evidence produced at trial is so lacking and unsubstantial that reasonable minds must necessarily entertain a reasonable doubt of defendant's guilt. In considering an issue raised with respect to insufficiency of the evidence, this Court views all of the evidence presented at trial in the light most favorable to the jury's verdict.[48]

A review of the record in this case convinces us that there was sufficient evidence for the jury to reasonably conclude that defendant knew the baseball mitts were not genuine. The record reflects that defendant told at least one customer during a sale unrelated to that for which he was charged that the mitts were made in the United States. Further, Chris Larsen of Al's Sporting Goods testified that he told defendant the gloves were not authentic Wilson baseball mitts. And in the taped phone conversation, Larsen told defendant that Wilson representatives said no A2000s were made in Korea and that he could not get the gloves direct from Wilson for such a low price. Finally, defendant told the jury he had been to Sunset Sports Center to price A2000s and, although he did not see an A2000, he saw several other Wilson gloves. Since the jury had in evidence authentic and counterfeit mitts, as well as a Wilson catalog with photos, they could have concluded that defendant knew from comparing the mitts that he was not selling genuine Wilson baseball mitts. It is undisputed that the thirty-eight gloves seized pursuant to the search warrant were in fact counterfeit Wilson baseball mitts.

Defendant also stated to Mr. Larsen, Mr. Hansen, and others that he was selling authentic mitts. It was reasonable for the jury to conclude that defendant had the necessary intent to defraud in light of the evidence inferring his knowledge that the mitts were counterfeit, coupled with the undisputed evidence that defendant was holding the mitts out as authentic Wilson gloves.

 Finally, the evidence supports the jury's conclusion that defendant had the intent to sell the thirty-eight mitts found by the police at his business.[49] In this regard, there were plaintiff's Exhibits seven and eight (two newspaper advertisements published close in time to the alleged offenses), advertising Wilson A2000 ball gloves at $50 each at defendant's place of business. Also, defendant's possession of the gloves, his past sales, and his phone conversation with Larsen support this conclusion.

## VII

Defendant's final point is that he was improperly convicted under the felony provisions of subsection 76–6–518(2)(c) (Repl. Vol. 8B, 1978 ed.). As noted above, this provision states that violation of subsection 76–6–518(1) is a third degree felony if the value defrauded or intended to be defrauded exceeds $1,000 but is less than $2,500.[50] Since the legislature has failed to define the "value defrauded or intended to be defrauded," we must establish a standard for determining this amount.

Although it has been said that section 76–6–518 was modeled after a similar provi-

---

**48.** *State v. McCullar,* 674 P.2d 117, 118 (Utah 1983) (footnotes omitted).

**49.** Defendant takes out of context and misconstrues a discussion in chambers between the prosecutor, defendant, and the trial judge for the proposition that defendant did not have the intent to sell the mitts found at his business.
[An in chambers discussion prior to the closing statements]
The Court: I think he's entitled to argue, if he wants to, that not all of those baseball gloves were held with the intent to sell or that your evidence doesn't show that. You may show the three or four that's out in the front room, but he can argue the ones in the backroom, there's really no evidence of what he intended to ever do with those.
Mr. Jenkins: There's evidence, the testimony from Mr. Larsen that he intended to sell 20 or—
The Court: That's one, that's—yes, and there's evidence of that and you can argue that, but he can argue the other implication too.
When read in context, it is clear that the trial court did not believe, as defendant asserts, that there was no evidence of defendant's intent to sell the ball gloves seized at his place of business.

**50.** *See supra* note 1.

sion in the Kentucky Penal Code,[51] its roots lie in the Model Penal Code's criminal simulation statute, section 224.2. Since there exists no meaningful legislative history concerning section 76–6–518, we turn to the background and comments of Model Penal Code section 224.2 to assist us in defining the grading provisions of section 76–6–518. We choose this method despite the fact that section 224.2 has no grading provisions comparable to those found in section 76–6–518.

The history of Model Penal Code section 224.2 is briefly described in an introductory note to article 224. There it explains that article 224 contains the basic forgery offense and additionally collects a series of provisions relating to differing forms of fraudulent behavior.[52] These offenses are closely related to the Model Penal Code's consolidated theft offenses and in several cases are designed to compliment the coverage of the theft provisions.[53] The introductory note goes on to state that section 224.2 (the Model Penal Code's criminal simulation statute)

> was originally included in the forgery offense [224.1] but was moved into a separate provision to facilitate draft-

ing.... *The offense is graded as a misdemeanor, although use of such a forgery in a scheme to defraud may well be treated as a felony under Section 223.3* [theft by deception] *where significant amounts of money are involved.*[54]

Subsection (2) of Model Penal Code section 223.1 provides a comprehensive grading scheme for theft, including theft by deception.[55] "Distinctions based on the value of the property stolen are supplemented by other criteria regarding as aggravating what would otherwise be minor theft."[56] In general, the Model Penal Code's forgery provisions provide no similar grading or valuation procedure.[57]

An examination of Utah's Criminal Code reflects that in the above respects, it generally parallels the Model Penal Code. Since section 76–6–518 is in essence a forgery statute,[58] it appears the most logical approach for defining its grading language is to turn to that used for Utah's theft offenses.[59] This conclusion is supported by the above discussion and the fact that the relationship between forgery and theft are significant in grading forgery offenses:[60]

---

**51.** J. Barney, Utah Criminal Code Commentary 194 (1973).

**52.** Model Penal Code, art. 224, Introductory Note at 278 (1980).

**53.** *Id.*

**54.** *Id.* at 279 (emphasis added). *See also* Model Penal Code § 224.2 comment 3 (1980) ("Major frauds perpetrated by means of simulated antiques, paintings, or other objects can be adequately reached under Section 223.3 as theft by deception.").

**55.** Model Penal Code § 223.1(2), § 223.1 comment 3, at 138–150 (1980).

**56.** Model Penal Code § 223.1 comment 3, at 138.

**57.** *See* Model Penal Code § 224.1(2) (1980); *but see* Model Penal Code § 224.13 comment 3 (1980).

**58.** *See* Model Penal Code § 224.2 comment 1, at 306–07, § 224 Introductory Note at 279.

**59.** The drafters of the Model Penal Code suggest that forgery arose as a separate branch of crimi-

nal law due to the shortcomings of other penal provisions. The drafters suggest that if these shortcomings are remedied in the area of fraud, attempt, complicity, and professional criminality, the need for a separate forgery offense is diminished. Nevertheless, forgery is

> retained as a separate offense in the Model Code, in part because the concept is so embedded in statute and popular understanding that legislative abolition seems unlikely. Moreover, the special danger of forgery as a threat to public confidence in important symbols of commerce and as a means of perpetrating large-scale fraud is worth recognition. There is also the point that the offense of forgery should be drafted to redress injuries beyond those that would be occasioned by conduct amounting to theft. Whether for these reasons or others, in any event, the judgment to retain forgery as a separate offense has been universally accepted in modern criminal codes.

Model Penal Code § 224.1 comment 2, at 284 (footnote omitted).

**60.** *See* Model Penal Code § 224.1 comment 2, at 285.

"The most serious instances of forgery will occur in connection with efforts to defraud, and it seems clear that a modern forgery provision should be drafted to avoid the imposition of penalties disproportionate to those authorized for fraud." [61]

 The grading of theft offenses in Utah is controlled by U.C.A., 1953, § 76-6-412(1) (Repl.Vol. 8B, 1978 ed.). This subsection was recently construed in *State v. Slowe*:[62] "Fair market value of the goods stolen in the area where the theft occurred is the standard for valuing property in theft cases." [63] Adapting this rule to our criminal simulation statute, we hold that the value defrauded or intended to be defrauded is that amount which the seller of such goods receives, or the price for which he holds the goods out for sale. We believe this is the best approach in light of the statute's purpose to protect the market system and the public from the effects of bogus goods.[64] In this case, $40 was the lowest price at which defendant held his mitts out for sale. Since the jury could reasonably have concluded that defendant held the thirty-eight mitts with the intent to sell, under the facts of this case, even using the $40 amount, defendant was properly convicted with a third degree felony in Count 1.

 The trial court instructed the jury as follows:

Before you can convict the defendant of the crime of CRIMINAL SIM-ULATION, Count I, a Third Degree Felony, you must find from the evidence, beyond a reasonable doubt.

. . . .

4. That the purported Wilson A-2000s which the Defendant had, and intended to sell, had reasonable values in the excess of $1,000.00. That the value is to be determined by the jury. It is the price that the baseball glove would sell for if they were as presented, and if the sale occurred between a well informed seller, under no complusion [sic] to sell, and an informed buyer, under no compulsion to buy, both believing the glove were [sic] as represented in the sale.

We believe this instruction was erroneous since the trial court instructed the jury that the value to be defrauded or intended to be defrauded was the market value of the genuine A2000 gloves. Although the trial court erroneously instructed the jury as to determination of value, the error was harmless since defendant held the thirty-eight gloves with the intent to sell the same for $40 a piece.[65]

Accordingly, defendant's conviction is affirmed.

HOWE, DURHAM and ZIMMERMAN, JJ., concur.

STEWART, Associate C.J., dissents.

---

61. *Id.*

62. 728 P.2d 110 (Utah 1985).

63. *Id.* at 112.

64. *Cf.* Model Penal Code, art. 224 Introductory Comment at 278 ("A separate forgery offense is needed in order to recognize the special effectiveness of forgery as a means of undermining public confidence in important symbols of commerce and as a means of perpetrating widespread fraud.").

65. Defendant's reliance on *State v. Barker*, 624 P.2d 694 (Utah 1981), for the proposition that the value of the thirty-eight gloves cannot be aggregated is misplaced. In *Barker*, the Court's decision turned on the fact that defendant committed sixteen distinct criminal acts upon the property of sixteen different people. *Id.* at 695. Here defendant owned and possessed all thirty-eight gloves with the intent to sell the same. Since this constituted one criminal offense, the rational of *Barker* does not apply in this case.