2004 UT App 224

**STATE of Utah, Plaintiff and Appellee,**

v.

**Robert Brian PEDOCKIE, Defendant and Appellant.**

No. 20030222–CA.

Court of Appeals of Utah.

July 1, 2004.

not entitled to fees and costs on appeal and its request is denied.

Sharon L. Preston, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Kris C. Leonard, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before BILLINGS, P.J., BENCH, Associate P.J., and THORNE, Jr., J.

## OPINION

BILLINGS, Presiding Judge:

¶ 1 Defendant Robert Pedockie appeals his conviction of aggravated kidnapping, a first degree felony in violation of Utah Code Annotated section 76–5–302 (1999). In particular, Defendant argues that (1) the trial court erred in denying his motion to dismiss because the State had failed to bring him to trial within 120 days in violation of Utah Code Annotated section 77–29–1 (1999) (Speedy Trial Statute); and (2) he was denied his state and federal constitutional right to assistance of counsel when the trial court determined that Defendant had waived his right to counsel and required him to represent himself.[1] We reverse and remand for a new trial.

## BACKGROUND

¶ 2 On January 3, 2001, Defendant went to the Ogden, Utah residence of his ex-girlfriend, Nicole Sather (Nicole), with his cousin, Justin Pedockie (Justin), and forced Nicole to accompany them on a drive in Defendant's truck. Justin carried a loaded rifle, and Defendant threatened to kill Nicole if she did not comply. At a stop in Payson, Utah, Nicole attempted to flee in Defendant's truck but she was shot at by Justin and ultimately stopped by Defendant. Later that day, Defendant dropped Justin off in Salt Lake City and then took Nicole to her home in Ogden where the two went inside and fell asleep. The next morning, as Defendant drove Nicole toward Park City, Utah, he threatened to kill her and then himself. At a stop for gas near Park City, Nicole slipped away from Defendant with help from one of the gas station clerks.

¶ 3 Defendant was charged with aggravated kidnapping. At Defendant's initial appearance on February 20, 2001, the Honorable Pamela G. Heffernan appointed an attorney from the Weber County Public Defenders' Association (PDA) to represent

---

1. Defendant also argues that the trial court deprived him of his right to trial by an impartial jury when it gave a lengthy statement to the jury explaining Defendant's lack of counsel at trial.

Because we reverse and remand for a new trial on other grounds, we do not address this argument.

him. Defendant's first PDA attorney was Michael Bouwhuis, who was released from representing Defendant because he was actively representing two of the State's main witnesses. Defendant was then represented by a second PDA attorney, Michael Boyle. A preliminary hearing was set for April 13, 2001. However, at a hearing on April 10, 2001, Judge Heffernan recused herself from the case, and it was reassigned to the Honorable Ernie W. Jones, who set a preliminary hearing for May 25, 2001.

¶ 4 Defendant requested a 120–day disposition of his case pursuant to the Speedy Trial Statute, and on April 10, 2001, the Division of Institutional Operations at the Utah State Prison received the written notice. The trial court attempted to schedule trial for July 12, 2001, but defense counsel was not available until early August. Accordingly, Judge Jones bound Defendant over for trial.

¶ 5 At a pretrial conference on August 1, 2001, trial was reset for December 10, 2001 at Defendant's request. Thus, Defendant waived his right to a 120–day disposition as to this continuance.

¶ 6 At a pretrial motion hearing on November 29, 2001, Defendant was represented by a third PDA attorney, James Retallick, because Boyle's contract with Weber County had been terminated. The prosecutor requested a continuance of the trial date on the grounds that she had a murder trial set for December 10 in a case that predated Defendant's case. Retallick was prepared to go to trial on December 10. However, the trial judge found good cause for granting the continuance and issued Findings of Fact, Conclusions of Law and Order on December 3, 2001. The trial court attempted to reschedule trial for January 7, 2002, and January 14, 2002, but defense counsel was unavailable. Trial was then reset for February 4, 2002.

¶ 7 At a pretrial conference on January 9, 2002, Retallick indicated that Defendant had requested that he be terminated from Defendant's case because Retallick refused to file motions that Defendant insisted be filed. In particular, Retallick stated that Defendant wanted him to file motions regarding, inter alia, prosecutorial misconduct, 120–day disposition, and change of venue. Retallick had explained to Defendant that he did not have grounds to file these particular motions and that he found the motions to be "absolutely frivolous." Defendant stated that he wanted counsel who would follow his direction and file the motions he requested.

¶ 8 The trial judge explained to Defendant that while he had a right to counsel, he did not have a right to counsel of his choice from PDA. The trial judge further explained that if Defendant did not want to accept the advice of Retallick, then he could either hire his own attorney or represent himself. Defendant indicated that he wanted Retallick to continue to represent him. At the end of the hearing, the court confirmed that the trial would go forward on February 4.

¶ 9 On January 23, 2002, the trial court held a hearing addressing the issue of Defendant's counsel. Both the court and Retallick had received letters from Defendant requesting that Retallick be removed from the case. At the hearing, Defendant reiterated his desire to have PDA released from his case and indicated that he had hired a private attorney, Ed Brass, to represent him. The court allowed PDA to withdraw from representing Defendant. Defendant requested that the trial be continued so that Brass could prepare for trial. At a subsequent hearing on January 30, 2002, the court granted Defendant's request for a continuance and set the trial for April 15, 2002.

¶ 10 In a telephone conference three days before trial, Brass informed the court that he could no longer represent Defendant because of an "ethical issue." The court allowed Brass to withdraw from the case and explained to Defendant that once the trial was reset, the court would not allow any further continuances. Specifically, the court stated, "I want [you] to understand, I'm not [going to] continue this case again.... I don't care what your excuse or reason is, you either get an attorney who will represent you on the matter or you're just [going to] represent yourself next time it's scheduled."

¶ 11 At another pretrial conference on May 1, 2002, Defendant indicated that he was in the process of hiring an attorney from Provo but that the attorney had not yet agreed to

take his case. At Defendant's request, the court set another pretrial conference for May 29, 2002. At that hearing, Defendant appeared pro se and indicated that he had been unable to retain private counsel because the attorneys he had contacted believed that it was unethical to file the motions that he wanted filed.

¶ 12 The court again informed Defendant that if he was unwilling to follow the advice of counsel, then he would have to represent himself. Defendant stated that he was not capable of representing himself and that he desired counsel. The court informed Defendant that if PDA was appointed again, it was final, and Defendant could not then retain private counsel. Defendant indicated that he did not want PDA to represent him because he intended to retain counsel.

¶ 13 The court appointed PDA as standby counsel and informed Defendant that he could still retain private counsel. The court cautioned Defendant that there would be no further continuances and scheduled the trial for September 30, 2002.

¶ 14 Defendant subsequently filed three motions: motion for a change of venue, motion to dismiss for prosecutorial misconduct, and motion to dismiss for violation of the Speedy Trial Act. A pretrial motion hearing was set for July 31, 2002. At the hearing, Defendant stated that he had hired Paul Grant as his attorney. On June 13, 2002, Paul Grant had entered an appearance of counsel for Defendant. However, Grant had moved to withdraw because after meeting with Defendant at the Utah State Prison, Defendant "told counsel that he does not want counsel to be his attorney of record." The court allowed Grant to withdraw. After the court determined that Grant was no longer Defendant's attorney, Defendant requested representation, and the court again appointed PDA to represent him.

¶ 15 The pretrial motion hearing was rescheduled for August 12, 2002, but because the prison failed to transport Defendant, the hearing was reset for the following day. Martin V. Gravis from PDA appeared on behalf of Defendant. The court informed Gravis that he was to act as standby counsel for Defendant. At the August 13, 2002 hearing, Defendant expressed his belief that the court had appointed PDA to represent him and again stated that he was not capable of representing himself. The court explained to Defendant that he would not be granted any more continuances and must argue his motions at that time. Defendant initially refused because he wanted an attorney to argue his motions and Gravis, as standby counsel, would not. The court explained to Defendant that Gravis was available to assist Defendant with legal issues but that Gravis was not going to argue his motions. Further, the court again informed Defendant that if Defendant wanted an attorney to represent him, he must follow that attorney's advice or represent himself. Defendant agreed to argue his motions as long as the record reflected Defendant's desire to have an attorney argue his motions and his objection to self-representation. The court denied all three motions.

¶ 16 At another pretrial hearing on August 21, 2002, Defendant again objected to representing himself and requested that counsel be appointed. Gravis again was present as standby counsel. The court again informed Defendant that he was not going to appoint another public defender because the court had "appointed several public defenders, [and] they've always asked to be recused because [Defendant] want[s] them to do something that's illegal that's a violation of the Canons of Ethics."

¶ 17 At the final pretrial conference on September 18, 2002, Defendant reiterated his desire to have counsel appointed. The court again stated that it was not going to appoint another attorney because Defendant refused to follow the advice of counsel. Defendant stated that he believed the court was denying him access to counsel.

¶ 18 At trial on September 30, 2002, Defendant again asked for counsel. The court found that Defendant "knowingly and intelligently waived [his] right to an attorney in this matter." Prior to seating the jury, Defendant complained that Gravis had refused to subpoena witnesses. The court again explained that Gravis did not represent Defendant but was only present to assist him with

legal issues such as jury selection. Defendant requested that Gravis be excused because "I was told by [Gravis] himself that he wasn't gonna argue anything, he wasn't gonna do anything." The court granted Defendant's request and released Gravis.

¶ 19 Following trial, the jury convicted Defendant of aggravated kidnapping. The trial court sentenced him to an indeterminate term of ten years to life in prison, to be served consecutively with a sentence he was already serving. Defendant appeals.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 20 We address two of Defendant's arguments on appeal. First, Defendant argues that the trial court erred in denying his motion to dismiss under the Speedy Trial Statute. " 'We review a trial court's determination that a defendant's charges should be dismissed pursuant to the Speedy Trial Statute for abuse of discretion.' " *State v. Hankerson*, 2003 UT App 433,¶ 7, 82 P.3d 1155 (quoting *State v. Coleman*, 2001 UT App 281,¶ 3, 34 P.3d 790). "An appellate court will find abuse of discretion only where there is no reasonable basis in the record to support the trial court's Speedy Trial Statute determination of good cause." *Id.* (quotations and citations omitted).

■ ¶ 21 Second, Defendant argues that he was denied his state and federal constitutional rights to counsel when the trial court determined that Defendant voluntarily, knowingly, and intelligently waived his right to counsel through his conduct and required Defendant to represent himself at trial.

2. The Speedy Trial Statute provides, in relevant part:

(1) Whenever a prisoner is serving a term of imprisonment in the state prison, jail or other penal or correctional institution of this state, and there is pending against the prisoner in this state any untried indictment or information, and the prisoner shall deliver to the warden, sheriff or custodial officer in authority, or any appropriate agent of the same, a written demand specifying the nature of the charge and the court wherein it is pending and requesting disposition of the pending charge, he shall be entitled to have the charge brought to trial within 120 days of the date of delivery of written notice.

. . . .

"Whether a waiver of counsel was made knowingly and intelligently is a mixed question of law and fact." *State v. Heaton*, 958 P.2d 911, 914 (Utah 1998). "Thus, we review the trial court's factual findings for clear error, and its legal conclusions for correctness." *State v. Vancleave*, 2001 UT App 228,¶ 5, 29 P.3d 680 (citation omitted).

## ANALYSIS

### I. Speedy Trial Statute

■ ¶ 22 Defendant argues that the trial court erred by denying his motion to dismiss under the Speedy Trial Statute.[2] When any Utah prisoner has an "untried indictment or information" and files a written demand "requesting disposition of the pending charge," that prisoner "shall be entitled to have the charge brought to trial within 120 days of the date of delivery" of the written demand. Utah Code Ann. § 77–29–1(1) (1999). However, a "reasonable continuance" to extend the statutory period may be granted to either party "for good cause shown in open court." *Id.* § 77–29–1(3). Should the prosecutor fail to bring the charge within 120 days, the defendant may move to dismiss the charge against him. *See id.* § 77–29–1(4). After reviewing the proceeding, "[i]f the court finds that the failure of the prosecuting attorney to have the matter heard within the time required is not supported by good cause, whether a previous motion for continuance was made or not, the court shall order the matter dismissed with prejudice." *Id.*

(3) After written demand is delivered as required in Subsection (1), the prosecuting attorney or the defendant or his counsel, for good cause shown in open court, with the prisoner or his counsel being present, may be granted any reasonable continuance.

(4) In the event the charge is not brought to trial within 120 days, or within such continuance as has been granted, and defendant or his counsel moves to dismiss the action, the court shall review the proceeding. If the court finds that the failure of the prosecuting attorney to have the matter heard within the time required is not supported by good cause, whether a previous motion for continuance was made or not, the court shall order the matter dismissed with prejudice.

Utah Code Ann. § 77–29–1 (1999).

■ ¶ 23 Determining whether the trial court erred in denying Defendant's motion to dismiss pursuant to the Speedy Trial Statute requires a two-step analysis. *See State v. Coleman*, 2001 UT App 281, ¶ 6, 34 P.3d 790. "First, we must determine when the 120-day period commenced and when it expired. Second, if the trial was held outside the 120-day period, we must then determine whether 'good cause' excused the delay." *State v. Heaton*, 958 P.2d 911, 916 (Utah 1998).

¶ 24 The parties agree that the 120-day period commenced on April 10, 2001. Thus, the statutory period expired on August 8, 2001. Defendant's four-day trial beginning on September 30, 2002, was held well beyond the expiration of the 120-day period. Therefore, we must determine whether good cause excused the delay that caused Defendant's trial to be held beyond the statutory period. *See id.*

■ ¶ 25 Defendant concedes that most of the delays were supported by good cause but argues that the trial court erred when it found good cause to grant the State's request to continue the trial from December 10, 2001, to February 4, 2002.[3] We grant significant deference to a trial court's finding of "good cause" and "find an abuse of discretion only where there is no reasonable basis in the record to support the trial court's Speedy Trial Statute determination of good cause." *State v. Hankerson*, 2003 UT App 433, ¶ 7, 82 P.3d 1155 (quotations and citation omitted). Under this standard, we conclude that the trial court did not abuse its discretion when it found good cause to delay the trial.

■ ¶ 26 "A finding of 'good cause' that will excuse failure of the prosecution to bring a defendant to trial within the time required means (1) delay caused by the defendant—such as asking for a continuance; or (2) a relatively short delay caused by unforseen problems arising immediately prior to trial." *State v. Houston*, 2003 UT App 416, ¶ 11, 82 P.3d 219 (quotations and citations omitted); *see also State v. Petersen*, 810 P.2d 421, 426 (Utah 1991). Furthermore, " 'extending the

trial date to a reasonable time outside the [120-day] period to accommodate, in part, defense counsel's schedule constitutes "good cause" under [the Speedy Trial Statute].' " *Houston*, 2003 UT App 416 at ¶ 11, 82 P.3d 219 (alterations in original) (quoting *Heaton*, 958 P.2d at 917).

¶ 27 In *State v. Wagenman*, 2003 UT App 146, 71 P.3d 184, the trial court had found good cause to delay defendant's jury trial beyond the 120-day period "to hear a case of higher priority." *Id.* at ¶ 11. We reversed and remanded with instructions to dismiss the defendant's case with prejudice because good cause was not shown in open court. *See id.* at ¶¶ 15–16. In particular, we held that the State had failed to request that the trial court make its good cause determination in open court pursuant to section 77–29–1(3). *See id.* at ¶ 15. Further, in the trial court's written order denying the defendant's motion to dismiss, the court had failed to provide any information regarding the higher priority case so that we could adequately review the good cause determination. *See id.* at ¶ 16.

¶ 28 Unlike the trial court in *Wagenman*, the trial court in Defendant's case made a good cause determination in open court pursuant to section 77–29–1(3) and made specific findings to support its good cause determination. In particular, the trial court found that good cause existed to grant the State's motion to continue the trial from December 10, 2001, to February 4, 2002, because the prosecutor had another high priority jury trial that was scheduled for the same time as Defendant's case. The trial court found that the State requested, in open court, to continue the trial for the following reasons: (1) the other case predated Defendant's case; (2) the other defendant was also in custody; (3) the other case was a first degree murder and aggravated robbery case; (4) Defendant's trial could not be rescheduled to an earlier date because the State would be unable to secure out-of-state witnesses prior to December 10; and (5) while the trial court and the State were both available to try the case the

---

3. Defendant asserts only that the delay from December 10, 2001, to February 4, 2002—a period of 56 days—was not supported by good cause. In addition, Defendant does not challenge any trial delays after February 4, 2002. Thus, we address only the specific delay Defendant challenges.

week of January 14, 2002, defense counsel was available only the week of February 4, 2002. Thus, the trial court concluded that good cause existed to delay the trial until February 4, 2002. These facts adequately provide a reasonable basis for the trial court's finding of good cause to grant the State's motion to continue the trial beyond the statutory period, and we find no abuse of discretion in this determination.

¶ 29 Furthermore, defense counsel's scheduling conflicts delayed resetting the trial until February 4, 2002. Specifically, when the State moved to continue the trial from December 10, 2001, the trial court attempted to reset the trial for January 7, 2002 and even offered to move another trial to ensure the trial was held in January. However, defense counsel informed the trial court that he had already scheduled trials during the weeks of January 7, 2002, and January 14, 2002. Defense counsel suggested the week of January 21, 2002, and offered to find someone to replace him at the trial on January 14, but codefendant's counsel had scheduling conflicts both of those weeks. Thus, the trial was reset for February 4, 2002, in part, to accommodate defense counsel's schedule. *See Houston,* 2003 UT App 416 at ¶ 11, 82 P.3d 219. Because the trial court found that good cause existed to grant the State's motion to continue, and because defense counsel's scheduling conflicts necessitated rescheduling the trial to February rather than January, we hold that the trial court properly denied Defendant's motion to dismiss.[4]

4. The analysis required under the Speedy Trial Statute is as follows: Once a court determines that the trial falls outside the 120–day limit, it then must determine whether the cause for and extent of the delay is wholly attributable to the defendant. If so, then good cause exists and no further analysis is necessary. If not, then the court must engage in a more traditional good cause analysis to determine whether the extent of the delay attributable to others occurred for good cause.

While this is the required analysis, because the case law may appear inconsistent regarding whether a good cause analysis is necessary when the delay beyond 120 days is attributable solely to a defendant, we briefly discuss the relevant cases.

In *State v. Heaton,* 958 P.2d 911 (Utah 1998), the defendant requested a preliminary hearing just ten days before the trial date. *See id.* at 916. To accommodate defendant's request, the trial court moved the trial date and held a preliminary hearing instead. *See id.* The trial court then spent eighteen days resolving defendant's motions. *See id.* Without explicitly engaging in a traditional good cause analysis, the Utah Supreme Court held that the delay effectively extended the 120–day deadline by eighteen days. *See id.* The court then stated that because the trial court had scheduled the trial beyond the disposition period, which included the eighteen-day delay attributable to the defendant, "we must proceed to step two of our inquiry to determine whether continuing the trial to accommodate, in part, defense counsel's schedule constitutes 'good cause' under section 77–29–1." *Id.*

The court did not explain why the first delay (related to the defendant's request for a preliminary hearing) did not seem to trigger a traditional good cause analysis, but the second delay (related, in part, to the defendant's scheduling conflicts) did trigger a traditional good cause analysis. *See id.* This makes it appear that the analysis is different for each delay. However, there really is no difference. Even though the court did not explicitly engage in a traditional good cause analysis for the first delay, it did hold that "the disposition period must be extended by the amount of time during which *the prisoner himself creates the delay." Id.* (emphasis added). Implicit in this holding is that whenever a delay can be attributed wholly to the defendant, good cause exists to extend the 120–day deadline *at least to that extent. See State v. Velasquez,* 641 P.2d 115, 116 (Utah 1982) (concluding that where defendant's trial date was originally scheduled less than one month after defendant's request for disposition and court granted defendant's request for continuance, defendant was responsible for the number of days during which continuance was granted and could not include those days in disposition period).

The fact that the *Heaton* court engaged in a traditional good cause analysis only for the second delay-which was caused only *in part* by defense counsel's scheduling conflicts and in part by the prosecutor's scheduling conflicts, *see* 958 P.2d at 916-does not demonstrate that the court did not find good cause for the first delay. The better reading is that while good cause is required for all delays beyond the disposition period, once the cause for and extent of the delay is found to be wholly attributable to the defendant, good cause exists, and no further analysis is required.

Cases decided after *Heaton* are in accord. For instance, in *State v. Coleman,* 2001 UT App 281, 34 P.3d 790, this court held that good cause existed to delay a trial for the time it took to adjudicate defendant's motion to dismiss, *see id.* at ¶ 11, and defense counsel's scheduling conflicts. *See id.* at ¶ 18. The fact that we used the word "tolling," which is only metaphorically apt, to describe the additional time added to the disposition, *see id.* at ¶ 19 n. 14, does not change the fact that good cause was required and found.

Also, in *State v. Peterson,* 2002 UT App 53, 42 P.3d 1258, we stated that because the defendant

## II. Waiver of Right to Counsel

 ¶30 Defendant argues that the trial court erred in finding that Defendant voluntarily, knowingly, and intelligently waived his state [5] and federal rights to counsel through his conduct. The Sixth Amendment of the United States Constitution guarantees every criminal defendant the right to assistance of counsel as well as the right to self-representation. *See State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) ("In *Faretta v. California*,[ 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975),] the United States Supreme Court noted that the [S]ixth [A]mendment ... implicitly guarantees the right of a competent accused to represent himself, without counsel, in state criminal proceedings." (footnotes omitted)).

 ¶31 However, "[b]ecause a defendant's choice of self-representation often results in detrimental consequences to the defendant, a trial court must be vigilant to assure that the choice is freely and expressly made 'with eyes open.' " *State v. Bakalov*, 1999 UT 45,¶15, 979 P.2d 799 (quoting *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2525). Thus, when there is doubt concerning the waiver of counsel, a presumption against waiver exists and any uncertainties must be resolved in the defendant's favor. *See State v. Heaton*, 958 P.2d 911, 917 (Utah 1998).

 ¶32 To waive the right to counsel, a defendant must "clearly and unequivocally" request self-representation. *Bakalov*, 1999 UT 45 at ¶16, 979 P.2d 799 (quotations

and citations omitted). Before honoring a defendant's decision to appear pro se, a trial court must determine whether that choice is being made voluntarily, knowingly, and intelligently. *See State v. McDonald*, 922 P.2d 776, 779 (Utah Ct.App.1996). However, "[t]hese requirements that the request to represent one's self be definite and voluntary do not mean ... 'that [a defendant's] decision to waive counsel must be entirely unconstrained.' " *Bakalov*, 1999 UT 45 at ¶17, 979 P.2d 799 (second alteration in original) (citations omitted). For instance, "[a] criminal defendant may be asked, in the interest of orderly procedures, to choose between waiver [of counsel] and another course of action as long as the choice presented to him is not constitutionally offensive." *Id.* (second alteration in original) (quotations and citations omitted). If the options presented are constitutionally sound, then a defendant's choice between or among them is voluntary. *See id.* at ¶20.

¶33 There is no question that Defendant in this case did not explicitly request self-representation or waive his right to counsel. At every appearance before the trial court, Defendant insisted that he had not waived his right to counsel and demanded representation. The trial court repeatedly offered Defendant the choice between accepting the representation of appointed counsel, hiring private counsel, or self-representation. Defendant rejected representation from PDA because he claimed PDA refused to file his

---

caused the delay by filing a motion to suppress, " 'the disposition period [should have been] extended by the amount of time during which defendant himself ... created delay.' " *Id.* at ¶8 (quoting *State v. Velasquez*, 641 P.2d 115, 116 (Utah 1982)) (alterations in original). Thus, we reversed the trial court's dismissal for failure to prosecute and held that twenty-seven days remained in the disposition period. *See id.* at ¶9. Although we did not explicitly engage in a traditional good cause analysis and we again used the somewhat misleading word "tolling," *id.* at ¶6, *Peterson* supports the rule that when the cause for and extent of the delay is wholly attributable to defendant, good cause exists for the delay.

Finally, in *State v. Houston*, 2003 UT App 416, 82 P.3d 219, we engaged in a traditional good cause analysis because while the delay was initially caused by defense counsel's scheduling conflict, the extent of the delay was in part due to scheduling conflicts the trial court had. *See id.*

at ¶13. We noted that, under *Heaton*, "extending the trial date to a reasonable time outside the [120–day] period to accommodate ... defense counsel's schedule constitutes good cause under [the Speedy Trial Statute]." *Id.* at ¶11 (first and third alterations in original) (quotations and citation omitted); *accord State v. Hankerson*, 2003 UT App 433, 82 P.3d 1155. Because the delay was not unreasonable under the circumstances, there existed good cause for the delay. *Houston*, 2003 UT App 416 at ¶13, 82 P.3d 219.

**5.** Because Defendant does not set forth a separate state constitutional argument, we need only address the federal question. *See State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988) ("As a general rule, we will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed.").

motions. Essentially, Defendant wanted counsel "strictly [to] follow tactics dictated by" him. *Id.* at ¶ 18.

■ ¶ 34 After Defendant rejected PDA representation because counsel would not follow his directions by filing what the attorney deemed unethical motions, the trial court presented Defendant with the choice of retaining private counsel or representing himself. While Defendant made some attempts to hire an attorney, these attempts were futile. "That [Defendant] did not particularly like the choice presented to him ... and that he did not want to proceed pro se are not sufficient reasons to render the choice constitutionally offensive." *Bakalov,* 1999 UT 45 at ¶ 21, 979 P.2d 799 (quotations and citations omitted). Therefore, "[w]e hold that the options offered [D]efendant were constitutionally permissible and ... his choice, *however reluctant or conditional,* was voluntary and unambiguous." *Id.* at ¶ 19 (emphasis added).

■ ¶ 35 We must next consider whether Defendant's waiver of counsel was knowing and intelligent. This inquiry " 'turns upon the particular facts and circumstances surrounding each case.' " *Id.* at ¶ 22 (quoting *State v. Frampton,* 737 P.2d 183, 187 (Utah 1987)). The Utah Supreme Court has highly "recommended that the trial court conduct an on-the-record colloquy with the accused in which the court should fully in-

form the accused 'of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.' "[6] *Id.* at ¶ 23 (quoting *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541). At a minimum, the trial court should

(1) advise the defendant of his constitutional right to the assistance of counsel, as well as his constitutional right to represent himself; (2) ascertain that the defendant possesses the intelligence and capacity to understand and appreciate the consequences of the decision to represent himself, including the expectation that the defendant will comply with technical rules and the recognition that presenting a defense is not just a matter of telling one's story; and (3) ascertain that the defendant comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case.

*Heaton,* 958 P.2d at 918. Here, the State concedes that the trial court did not engage in the requisite colloquy.[7] Thus, we must determine whether extraordinary circumstances exist that warrant a de novo review of the record. *See id.* Neither the supreme court nor this court has determined what extraordinary circumstances would trigger de novo review. However, we need not de-

---

6. The Utah Supreme Court has repeatedly and strongly recommended, but not mandated, that trial courts address these areas using the sixteen-point colloquy set forth in *State v. Frampton,* 737 P.2d 183, 187 n. 12 (Utah 1987). *See State v. Bakalov,* 1999 UT 45, ¶¶ 23–24, 979 P.2d 799; *State v. Heaton,* 958 P.2d 911, 918 n. 5 (Utah 1998).

7. In fact, when prompted by the State to engage in a colloquy with Defendant the trial court refused.

[The State]: Judge, I think that we do need to make a record under *Heaton* ... [a]nd explain to [Defendant] all of those things that are outlined under *Heaton* about law school and rules of evidence, that you won't help him, all of those kind of things. Just to make sure that ... his election to represent himself at the time of trial is voluntary and knowing.

The Court: Well, but the problem is he doesn't want to represent himself.... But every time he hires an attorney, the attorney said I'm not going to do something that's unethical,

I won't represent you anymore. That's the problem we're running into. He doesn't want to represent himself.

[The State]: But I think, Judge, that under *Heaton* if you go through those options and explain to him even absent all of those things, absent any of the help, if he doesn't have an attorney for the next trial setting he will be representing himself and that that's his election and otherwise—

The Court: Okay. But I guess the problem I'm having—and I understand what you're saying—but what good does it do to explain to him the disadvantages of representing himself? He doesn't want to represent himself. But on the other side, every time we give him an attorney or have him hire an attorney, the attorney withdraws on the case.

[The State]: Because then at that point you can force him to represent himself.

However, the trial court failed to follow the State's recommendation.

cide whether extraordinary circumstances exist to allow us to look to the record as a whole to determine whether Defendant knowingly and intelligently waived his right to counsel because there is simply nothing in the record to persuade us that his waiver was knowing and intelligent.

¶ 36 We conclude that even if extraordinary circumstances exist warranting a de novo review, while Defendant voluntarily waived his right to counsel through his dilatory conduct, he did not do so knowingly and intelligently. An examination of the record reveals that Defendant understood that he had a right to the assistance of counsel, as well as a right to represent himself. Defendant invoked that right at every hearing and incessantly asserted that he did not want to represent himself because he was not capable of doing so.

¶ 37 Furthermore, Defendant had some comprehension of the procedures and practices involved in a criminal trial. He understood that counsel was necessary for preparing and arguing his motions, for choosing the jury, presenting argument, examining witnesses, subpoenaing witnesses, and obtaining transcripts. Thus, even though Defendant continually asserted that he was not capable of representing himself, there is some evidence in the record establishing that he possessed the intelligence and capacity to represent himself. However, we are not persuaded that without *any* warnings from the trial court at *any time* as to the inherent dangers of self-representation involving such a serious offense, that he in fact understood the consequences of representing himself. *See id.*

¶ 38 Furthermore, there is nothing in the record that would demonstrate Defendant's understanding of the nature of the charge against him and the range of possible punishments. The State argues that the trial court's reading of the information at Defendant's initial appearance is sufficient. We disagree. There was no indication by Defendant at this initial appearance that he understood the severity of the charge or what punishments he was likely facing. In fact, the record reveals that the clerk of the court merely read the information and that the trial court never engaged Defendant in a discussion to determine his level of understanding.

¶ 39 In *State v. Petty*, 2001 UT App 396, 38 P.3d 998, the trial court engaged the defendant in a limited colloquy but failed to address whether he understood the nature of the charges and proceedings and the range of possible punishments. *See id.* at ¶ 7. Because the trial court made no findings of fact, we examined the text of the limited colloquy and held that we could "discern no indication of [the defendant's] level of understanding concerning the nature of the charges against him, or the range of possible penalties he faced." *Id.* at ¶ 11. Thus, we concluded that the defendant did not knowingly and intelligently waive his right to counsel. *See id.* Similarly, there are no statements by Defendant anywhere in the record that would indicate that he understood the nature of the charge and range of possible punishments. "Accordingly, absent a discussion of the nature of the charges and the range of possible penalties [Defendant] faced, we cannot say that [Defendant] had a proper understanding of the dangers and disadvantages of self-representation." *Id.* at ¶ 8 (quotations and citations omitted).

¶ 40 While we do not wish to reward Defendant's dilatory conduct, in light of the strong presumption against waiver, we hold that Defendant did not knowingly and intelligently waive his right to counsel. As our supreme court has recognized,

> [t]he right to have the assistance of counsel in a criminal trial is a fundamental constitutional right which must be jealously protected by the trial court.... "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake— is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused."

*Heaton,* 958 P.2d at 917 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023,

82 L.Ed. 1461 (1938)).[8] Therefore, we hold that while Defendant voluntarily waived his right to counsel through his conduct, he did not do so knowingly and intelligently. Consequently, we reverse Defendant's conviction and remand for a new trial.

## CONCLUSION

¶ 41 We conclude that the trial court properly denied Defendant's motion to dismiss under the Speedy Trial Act. However, we hold that the trial court erred in finding that the Defendant knowingly and intelligently waived his right to counsel. Accordingly, we reverse Defendant's conviction and remand for a new trial.

¶ 42 WE CONCUR: RUSSELL W. BENCH, Associate Presiding Judge and WILLIAM A. THORNE JR., Judge.

**8.** We note that this problem could have been constitutionally solved early in the process had the trial judge advised Defendant of the dire consequences of refusing counsel who would not follow his instructions. Specifically, when Defendant initially indicated that he wanted Retallick released from his case because he refused to file the motions Defendant insisted be filed, the judge could have explained to Defendant the following: (1) counsel cannot be forced to file motions he believes to be frivolous; (2) if Defendant continues to insist that frivolous motions be filed and subsequent counsel is removed from the case, then Defendant would be required to represent himself; (3) the serious nature of the charges he is facing and the potential punishment; and (4) because of the multiple dangers and disadvantages involved in self-representation at a felony trial the choice to represent oneself cannot be undertaken lightly. While the trial judge did inform Defendant that he did not have a right to counsel of his choice from PDA and that he *may* be required to represent himself, the trial judge failed to inform Defendant of the likely perilous repercussions of self-representation.