2006 UT 28

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Robert Brian PEDOCKIE, Defendant and Respondent.**

**No. 20040746.**

Supreme Court of Utah.

May 12, 2006.

Mark L. Shurtleff, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Sharon L. Preston, Salt Lake City, for defendant.

PARRISH, Justice:

¶ 1 Defendant Robert Brian Pedockie was charged with aggravated kidnapping, a first degree felony. During pretrial proceedings, Pedockie was represented by a string of various public defenders and private attorneys, all of whom either withdrew or were fired. Despite Pedockie's invocation of his Sixth Amendment right to counsel, the trial court allowed the trial to proceed with Pedockie representing himself. Pedockie was convicted and appealed.

¶ 2 The court of appeals held that Pedockie voluntarily waived his right to counsel through his dilatory conduct. It nevertheless reversed his conviction, holding that the waiver was not knowing and intelligent. We affirm the reversal of Pedockie's conviction, but on different grounds. Like the court of appeals, we recognize that an accused may voluntarily waive his right to counsel through his conduct. But we find no such voluntary waiver in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 We recite the facts in a manner consistent with the jury's verdict. On January 3, 2001, Pedockie and his cousin kidnapped Nicole Sather, Pedockie's ex-girlfriend. When Sather attempted to escape from Pedockie's truck, Pedockie's cousin shot at her, and Pedockie restrained her. The next day, Pedockie threatened to kill Sather and himself. When Pedockie stopped for gas, Sather escaped with the help of a gas station employee. Pedockie was later arrested and charged with aggravated kidnapping, a first degree felony, in violation of Utah Code section 76–5–302.[1]

¶ 4 At Pedockie's initial appearance on February 20, 2001, the trial judge found Pedockie indigent and appointed the Weber County Public Defenders' Association ("PDA") to defend him. The judge also gave Pedockie a copy of the Information that had been filed and advised him of the charges against him and the potential penalties associated therewith. Pedockie requested disposition of his case according to the Speedy Trial Statute, which entitles a defendant who is imprisoned to be tried within 120 days of the request.[2] At a later hearing, the judge set Pedockie's jury trial for August 13, 2001.

¶ 5 On August 1, 2001, at the request of Pedockie's PDA attorney, who needed additional time to prepare, the trial judge continued the trial to December 10, 2001. The trial was subsequently continued to February 4, 2002, to accommodate a conflict in the prosecutor's schedule.

¶ 6 Scheduling conflicts, however, were not the only difficulties arising during pretrial proceedings. Difficulties between Pedockie and his attorneys were a recurring theme. Pedockie's first two PDA attorneys withdrew, through no fault of Pedockie, because one had a conflict of interest and the other lost his contract with the PDA. And less than a month before trial, Pedockie's third PDA attorney, James Retallick, also moved to withdraw.

¶ 7 Retallick informed the trial judge that Pedockie was insisting that he file four motions that Retallick believed were "absolutely frivolous." Although Retallick had explained to Pedockie why he could not in good faith file the motions, Pedockie nevertheless believed that Retallick was not representing his best interests and requested the appointment of a PDA attorney who would file them. The trial judge explained that Pedockie did not have a right to "pick and choose" an attorney from the PDA, stating, "I can appoint an

---

1. Utah Code Ann. § 76–5–302 (1999).

2. *Id.*

attorney to work with you but if you don't want to accept his advice, you've either got to represent yourself or get your own attorney." Pedockie stated that he did not wish to proceed pro se and agreed to have Retallick continue the representation. The next day, however, Pedockie fired him.

¶ 8 A couple of weeks later, Pedockie requested that the judge release the PDA office because he had hired private attorney Ed Brass to represent him. Stating that Pedockie was entitled to legal representation, the trial judge granted his request and continued the trial to April 15, 2002, to give Brass time to prepare.

¶ 9 Three days before trial, Brass moved to withdraw as counsel, stating that he had an ethical conflict with Pedockie that made representation impossible. Brass was unwilling to stay on the case as standby counsel because he did not believe that Pedockie was "sophisticated enough to handle a first degree felony trial" without full-time counsel. The trial judge reluctantly granted Brass's motion to withdraw, stating, "I want Mr. Pedockie to understand, I'm not gonna continue this case again.... [Y]ou either get an attorney who will represent you on the matter or you're just gonna represent yourself next time it's scheduled."

¶ 10 On May 1, Pedockie appeared in court without an attorney and reported that he was still attempting to hire one. The judge continued the case until May 29 and again admonished Pedockie to get an attorney. But on May 29, Pedockie again appeared without counsel, explaining that he had been unable to find an attorney to file his motion for prosecutorial misconduct because "[e]verybody thinks it's unethical to bring."

¶ 11 The trial judge warned Pedockie that he was going to set the case for trial and that Pedockie would have to get an attorney or proceed without one. Pedockie emphasized the seriousness of his case, explaining that "you're talking about my life at stake." The prosecutor asked the judge to make a record that Pedockie's "election to represent himself at the time of trial is voluntary and knowing." The judge responded that "the problem is he doesn't want to represent himself.... But on the other side, every time we

give him an attorney or have him hire an attorney, the attorney withdraws." When Pedockie reiterated that he wanted another attorney appointed who would file his motions, the judge stated, "See, that's the problem. You need to start following the advice of the attorney that's representing you instead of you trying to tell him what to do."

¶ 12 After scheduling trial for September 30, 2002, the trial judge informed Pedockie that he could hire a private attorney, but warned him that the trial would not be continued again. The trial judge also appointed standby counsel, but clarified that Pedockie was still responsible for filing and arguing his own motions.

¶ 13 At a July 31 hearing, Pedockie announced that he had hired Paul Grant as his attorney but that Grant had indicated he was going to withdraw. Pedockie asked the judge to appoint primary counsel who could assist him in arguing his motions, and the judge chastised him for his unwillingness to follow the advice of his prior attorneys. But when Pedockie persisted, the trial judge relented:

> The Court: I can appoint the public defenders' office. I cannot pick and choose which attorney represents you. There are at least three people in that office that you've had, and now they no longer can represent you. So do you want the public defenders' office or not?
>
> Mr. Pedockie: As of right now, I'd like to—I need a attorney—
>
> The Court: Okay.
>
> Mr. Pedockie:—Unless you're gonna—
>
> The Court: I'll appoint the public defenders' office for the third time then. Okay.

A hearing on Pedockie's motions was then set for August 12. Thereafter, the trial judge indicated that Pedockie needed to give a copy of his motions to the PDA attorney prior to the hearing, and the clerk suggested that they coordinate with the PDA to make sure August 12 was an acceptable date. All of this was consistent with the fact that the PDA had been appointed to act as Pedockie's primary, rather than standby, counsel.

¶ 14 Prison officials failed to transport Pedockie to the August 12 hearing. In Pedockie's absence, the trial judge informed Martin Gravis, the PDA attorney who had been assigned to represent Pedockie following the July 31 hearing, that he "was not inclined to appoint a public defender" for Pedockie and that Gravis was there only in the capacity as standby counsel. The motion hearing was then rescheduled for the following day.

¶ 15 The next day, Pedockie expressed surprise and confusion when he learned that Gravis was acting only as standby counsel and would not argue the motions. Pedockie again requested that the court appoint an attorney to argue his motions, emphasizing their importance to his case and his desire to see them argued properly. The trial judge declined, indicating that he would not appoint an attorney because of Pedockie's insistence that his attorneys pursue unethical courses of action. The judge reiterated that, if Pedockie wanted an attorney, he would have to hire one himself.

¶ 16 During a hearing on August 21, the trial judge again scolded Pedockie, refused to appoint an attorney, and informed Pedockie that he must hire a private attorney or proceed pro se. He told Pedockie that his attorneys have "always asked to be recused because you want them to do something that's illegal that's a violation of the Canons of Ethics." Pedockie insisted that he could not afford a private attorney and that he was invoking his Sixth Amendment right to counsel.

¶ 17 At a September 18 pretrial conference, Pedockie failed to submit the jury instructions that his standby counsel had prepared and again requested that an attorney be appointed to represent him. The trial judge refused, stating that he had waived his right to counsel.

¶ 18 Pedockie's jury trial began on September 30, 2002. Pedockie again requested counsel, complaining that he was neither "educated nor familiar with the rules and proceedings" of the court and did not know how many juror challenges he had. The trial

judge denied Pedockie's request, finding that Pedockie had knowingly and intelligently waived his right to an attorney. Pedockie then asked that standby counsel be excused from the case because the whole case was a "scam and a mockracy" and standby counsel was "just taking up the taxpayers' dollars." After explaining the benefits of having standby counsel who was trained in the law, the judge granted Pedockie's request, and Pedockie proceeded to represent himself.

¶ 19 The jury found Pedockie guilty of aggravated kidnapping, and he was sentenced. Pedockie appealed, arguing that he was deprived of his constitutional right to assistance of counsel.[3] The court of appeals reversed Pedockie's conviction and remanded the case for a new trial.

¶ 20 The court of appeals first considered whether Pedockie's conduct evidenced a voluntary waiver of his right to counsel. Recognizing that a defendant's decision to waive counsel may be subject to constitutionally permissible constraints, the court of appeals reasoned that the trial judge reasonably required Pedockie to either accept representation by the PDA, hire private counsel, or proceed pro se. It therefore held that Pedockie had voluntarily waived his right to counsel through his conduct.

¶ 21 The court of appeals then considered whether Pedockie's waiver was knowing and intelligent. Because the trial judge had failed to conduct an on-the-record colloquy with Pedockie to inform him of the dangers and disadvantages of self-representation, the court of appeals was confronted with the question of whether the case involved "extraordinary circumstances" that would require a de novo review of the record. It concluded it need not decide that question because there was "nothing in the record to persuade [it] that [Pedockie's] waiver was knowing and intelligent."[4] It therefore reversed Pedockie's conviction and remanded the case for a new trial.

¶ 22 The State petitioned for certiorari, which we granted. We have jurisdiction pur-

3. *State v. Pedockie*, 2004 UT App 224, ¶ 1, 95 P.3d 1182.

4. *Id.* ¶ 35.

suant to Utah Code section 78–2–2(3)(a).[5]

## STANDARD OF REVIEW

¶ 23 "On certiorari, we review the decision of the court of appeals, not the decision of the trial court."[6] Whether Pedockie voluntarily, knowingly, and intelligently waived his right to counsel is a mixed question of law and fact.[7] While we review questions of law for correctness, a trial court's factual findings may be reversed on appeal only if they are clearly erroneous.[8]

## ANALYSIS

¶ 24 The State urges us to find that Pedockie waived his right to counsel through his dilatory conduct and that he did so knowingly and intelligently. Whether a defendant may waive his right to counsel through his conduct is an issue of first impression in this court. We therefore begin by addressing the substantive requirements for waiver of a defendant's right to counsel under the Sixth Amendment and the procedure to be followed by appellate courts when reviewing cases of alleged waiver.[9] With these substantive and procedural requirements in mind, we turn to the court of appeals' conclusion that Pedockie waived his right to counsel through his dilatory conduct but that the waiver was invalid because it was not knowing and intelligent.

## I. THE RIGHT TO ASSISTANCE OF COUNSEL

¶ 25 The Sixth Amendment to the United States Constitution guarantees defendants the right to counsel in felony proceedings.[10] As the United States Supreme Court articulated in *Powell v. Alabama,* "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."[11]

¶ 26 Defendants also have the right to waive their right to counsel. The United States Supreme Court in *Faretta v. California*[12] held that the Sixth Amendment implicitly guarantees criminal defendants the ability to waive their right to the assistance of counsel and proceed pro se. Before permitting a defendant to do so, however, a trial court should ensure that the waiver is voluntary, knowing, and intelligent.[13] A defendant should "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing."[14]

¶ 27 Courts have recognized three methods pursuant to which a defendant may give up his constitutional right to the assistance of counsel: waiver, forfeiture, and waiver by conduct.[15] We outline the elements of each.

### A. True Waiver

¶ 28 True waiver is the most common method by which defendants forsake their right to counsel. True waiver typically occurs when a defendant affirmatively requests permission to proceed pro se.[16] In *State v. Bakalov,* we required that defendants "clearly and unequivocally" request self-representation in order to waive their right to coun-

---

5. Utah Code Ann. § 78–2–2(3)(a) (2002).

6. *Bear River Mut. Ins. Co. v. Wall,* 1999 UT 33, ¶ 4, 978 P.2d 460.

7. *State v. Heaton,* 958 P.2d 911, 914 (Utah 1998).

8. *State v. Harmon,* 910 P.2d 1196, 1199 (Utah 1995).

9. *State v. Pedockie,* 2004 UT App 224, ¶ 30 n. 5, 95 P.3d 1182 (noting that Pedockie did not preserve a state constitutional claim).

10. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.").

11. 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

12. 422 U.S. 806, 818–32, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

13. *See id.* at 835, 95 S.Ct. 2525.

14. *Id.* (internal quotation marks omitted).

15. *See United States v. Goldberg,* 67 F.3d 1092, 1099 (3d Cir.1995).

16. *Id.*

sel.[17]

¶ 29 When a defendant requests to proceed pro se, his waiver will be valid only if he acts knowingly and intelligently, being aware of the dangers inherent in self-representation.[18] The most reliable way for a trial court to determine whether a defendant is aware of the dangers and disadvantages of self-representation is to engage in a colloquy on the record. At times, however, we have found a waiver of the right to counsel absent a colloquy. For example, in *State v. Frampton,* we found that a defendant knowingly and intelligently waived his right to counsel when he affirmatively requested to proceed pro se despite the fact that the trial court had not engaged in a colloquy.[19] We reasoned that the defendant should have realized the "value of counsel" because he was represented by counsel in a prior trial.[20] Additionally, we concluded that he must have realized the seriousness of the charges filed against him because the judge had appointed standby counsel over his objection[21] and the judge had explained the charges, including the maximum penalty associated therewith, in two prior trials involving the same charges.[22]

¶ 30 True waiver does not apply in this case because Pedockie never expressed a desire to represent himself. To the contrary, the record is replete with instances of Pedockie insisting that he "want[ed] adequate counsel" and that he was "not going to represent [himself]."

### B. Forfeiture

¶ 31 While waiver is an intentional relinquishment of a known right, forfeiture occupies the opposite end of the spectrum. Unlike waiver, "forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." [23]

¶ 32 In *United States v. Goldberg,* the United States Court of Appeals for the Third Circuit observed that a defendant may be deemed to have forfeited his right to counsel when he engages in "extremely dilatory conduct" or abusive behavior, such as physically assaulting counsel.[24] When circumstances are egregious enough to constitute forfeiture, a court need not determine whether a defendant understands the risks of self-representation or warn him that he will lose his right to counsel. But because of its drastic nature, a defendant must engage in extreme conduct before forfeiture may be imposed.[25] We find no basis for imposing forfeiture under the facts presented here.

### C. Waiver by Conduct

¶ 33 Waiver by conduct, often referred to as implied waiver, combines elements of both true waiver and forfeiture.[26] "Once a defendant has been warned that he will lose his attorney if he engages in dilatory tactics, any misconduct thereafter may be treated as an implied request to proceed pro se and thus, as a waiver of the right to counsel." [27] The conduct required to give rise to an implied waiver does not have to be as extreme as that required for forfeiture. And unlike the situation in cases of true waiver, a defendant need not intend to relinquish the right to counsel.[28] But the defendant must have been warned that continuation of the unacceptable conduct will result in a waiver of the right to counsel. As is the case in a true waiver situation, the waiver also must be knowing and intelligent. In other words, the

17. 1999 UT 45, ¶ 16, 979 P.2d 799.

18. *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525.

19. 737 P.2d 183, 187–89 (Utah 1987).

20. *Id.* at 189.

21. *Id.* at 189 n. 19.

22. *Id.* at 189.

23. *United States v. Goldberg,* 67 F.3d 1092, 1100 (3d Cir.1995).

24. *Id.* at 1101.

25. *Id.*

26. *Id.* at 1100–01.

27. *Id.* at 1100.

28. *Id.* at 1101.

defendant must have also possessed an awareness of the dangers and disadvantages of self-representation at the time of the implied waiver.[29]

¶ 34 While the United States Supreme Court has never specifically addressed whether a defendant may waive the right to counsel through inappropriate conduct,[30] it has recognized that a defendant may lose the constitutional right to be present at trial because of such conduct.[31] In *Illinois v. Allen,* the trial court had warned the defendant that he would lose his right to be present at his trial because of his disruptive behavior, yet he continued "in a manner so disorderly, disruptive, and disrespectful of the court that his trial [could not] be carried on with him in the courtroom."[32] Consequently, he lost the constitutional right to be present, even though he did not affirmatively relinquish it.[33] Thus, *Allen* suggests that a defendant can lose constitutional rights because of his conduct so long as he is *"aware of the consequences of his actions."*[34]

¶ 35 In *United States v. Weninger,*[35] the United States Court of Appeals for the Tenth Circuit applied analogous analysis in holding that the defendant had waived his right to counsel by failing to secure an attorney for trial. The defendant was given ample time and was warned to obtain an attorney, but he strategically and stubbornly failed to do so.[36] The Tenth Circuit held that this dilatory conduct should be treated as a request to proceed pro se.[37]

■ ¶ 36 In summary, before we will find an implied waiver of the right to counsel based on a defendant's conduct, two requirements must be satisfied. First, the implied waiver must be voluntary. Second, the waiver must have been made knowingly and intelligently.

■ ¶ 37 For an implied waiver to be voluntary, the trial court must warn the defendant of the specific conduct that will give rise to the waiver of his right to counsel. In other words, when a trial court believes that a defendant's conduct is unacceptable and will result in a waiver of his right to counsel, the court must warn the defendant that continuation of the unacceptable conduct will be treated as an implied request to proceed pro se and, thus, as a waiver of the right to counsel.[38] This warning must be explicit so that a defendant clearly understands both the nature of the unacceptable conduct and the implications of any such future conduct.

■ ¶ 38 For an implied waiver to be knowing and intelligent, the trial court must ensure that the defendant is cognizant of the dangers and disadvantages of self-representation. The court should explain the consequences of a decision to proceed pro se and, at a minimum, must

> ascertain that the defendant possesses the intelligence and capacity to understand and appreciate the consequences of the decision to represent himself, including the expectation that the defendant will comply with technical rules and the recognition that presenting a defense is not just a matter of telling one's story; and ... ascertain that the defendant comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case.[39]

29. *Id.* at 1102.

30. *Id.*

31. *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

32. *Id.*

33. *Id.*

34. *Goldberg,* 67 F.3d at 1101 (emphasis added).

35. 624 F.2d 163, 166–67 (10th Cir.1980).

36. *Id.; see also United States v. Bauer,* 956 F.2d 693, 694 (7th Cir.1992) (finding that the combi-

nation of the defendant's "ability to pay for counsel plus refusal to do so ... waive[d] the right to counsel at trial").

37. *Weninger,* 624 F.2d at 166–67; *see also Goldberg,* 67 F.3d at 1102–03 (refusing to find waiver by conduct because the court had not made the defendant aware of the risks of self-representation).

38. *Goldberg,* 67 F.3d at 1100–03.

39. *State v. Heaton,* 958 P.2d 911, 918 (Utah 1998).

¶ 39 Trial courts generally evaluate a defendant's understanding and intelligence by conducting a colloquy on the record. In those cases where a defendant continues to insist on his right to counsel, it may seem awkward for a trial court to engage in a typical colloquy regarding the inherent dangers of self-representation. But we still strongly encourage trial courts to do so as a means to ensure that a defendant is aware of the disadvantages and dangers of self-representation.[40]

## II. DETERMINING THE VALIDITY OF A WAIVER

¶ 40 While we have urged that trial courts engage in an on-the-record colloquy with defendants to ensure that they are aware of the dangers and disadvantages of self-representation, we have not imposed an absolute requirement that they do so. Rather, we have recognized that the validity of a defendant's waiver turns upon the particular facts and circumstances surrounding each case.

¶ 41 Relying on admittedly confusing language from some of our prior cases, the court of appeals stated that, in the absence of a colloquy, appellate courts are required to conduct a de novo review of the record to determine the validity of a defendant's waiver of the right to counsel only in "extraordinary circumstances." It then concluded that it need not evaluate Pedockie's case for such extraordinary circumstances because "there is simply nothing in the record to persuade us that [Pedockie's] waiver was knowing and intelligent." [41]

¶ 42 We take this opportunity to clarify our prior case law regarding appellate review in cases involving waiver of the right to counsel. As previously stated, before we will accept a defendant's waiver of his right to counsel, we have required that he be "aware of the dangers and disadvantages[ ] of self-representation," [42] and we continue to strongly recommend a colloquy on the record as the preferred method of determining whether a defendant is aware of these risks. Indeed, a trial court generally cannot determine a defendant's understanding without engaging in the "penetrating questioning" found in a colloquy.[43] The sixteen-point colloquy found in *State v. Frampton*[44] establishes a sound framework for efficient and complete questioning. Moreover, on appeal, such a colloquy provides the reviewing court with " 'an objective basis for review' upon the almost inevitable challenge to the waiver by the defendant who proceeds pro se and is subsequently convicted." [45]

¶ 43 In declining to review the record de novo, the court of appeals relied on *State v. Heaton*, where we held that a reviewing court could engage in de novo review only in "extraordinary circumstances." [46] But in two cases following *Heaton*, we found that de novo review was appropriate in the absence of a colloquy and never indicated that such a review was dependent on the existence of extraordinary circumstances.[47] We now clarify that it is not.

¶ 44 When this court stated in *Heaton* that a de novo review was appropriate only in extraordinary circumstances, we cited the Ninth Circuit case of *Harding v. Lewis*.[48] But the *Harding* court actually allowed for de novo review absent a colloquy; it only

40. *See Trujillo v. State*, 2 P.3d 567, 575 (Wyo. 2000) (explaining that a warning in a waiver by conduct situation "should be comparable in content to the warning given to a defendant who affirmatively asserts his right to self-representation").

41. *State v. Pedockie*, 2004 UT App 224, ¶ 35, 95 P.3d 1182.

42. *State v. Frampton*, 737 P.2d 183, 187 (Utah 1987) (internal quotation marks and citation omitted).

43. *Id.*

44. *Id.* at 187 n. 12.

45. Wayne R. LaFave et al., 3 *Criminal Procedure* § 11.5(c) (2d ed.1999) (quoting *People v. Sawyer*, 57 N.Y.2d 12, 453 N.Y.S.2d 418, 438 N.E.2d 1133, 1138 (1982)); *see also State v. Heaton*, 958 P.2d 911, 918 (Utah 1998).

46. 958 P.2d at 918.

47. *See State v. Hassan*, 2004 UT 99, ¶ 22, 108 P.3d 695; *State v. Arguelles*, 2003 UT 1, ¶ 70, 63 P.3d 731.

48. 834 F.2d 853, 857 (9th Cir.1987).

explained that a valid waiver absent a colloquy should "rarely" be found.[49] Our mistaken interpretation of *Harding,* combined with the fact that *Heaton* is inconsistent with this court's more recent decisions, suggests the need for us to rearticulate the procedure to be followed by reviewing courts when evaluating the validity of a defendant's waiver of the right to counsel in the absence of a colloquy.[50]

¶ 45 Absent a colloquy on the record, a reviewing court should review the record de novo to determine whether the defendant knowingly and intelligently waived his right to counsel. De novo review is appropriate because the validity of a waiver does not turn upon "whether the trial judge actually conducted the colloquy,"[51] but upon whether the defendant understood the consequences of waiver.[52] A de novo review allows a reviewing court to analyze the "particular facts and circumstances surrounding each case" to make that determination.[53] But we pause to note that, considering the strong presumption against waiver and the fundamental nature of the right to counsel, any doubts must be resolved in favor of the defendant. We therefore anticipate that reviewing courts will rarely find a valid waiver of the right to counsel absent a colloquy.

## III. PEDOCKIE'S CASE

¶ 46 We now turn to the particular facts of this case. This case is a prime example of the confusion and inconsistency that can permeate proceedings in the absence of an explicit warning and colloquy regarding the right to counsel. In the face of such confusion, we cannot find a voluntary, knowing, or intelligent waiver of Pedockie's right to counsel.

¶ 47 First, we conclude that Pedockie did not voluntarily waive his right to counsel through his conduct. While the trial judge repeatedly chastised Pedockie for his past unwillingness to follow counsel's advice, his

statements with respect to Pedockie's right to appointed counsel were inconsistent and confusing.

¶ 48 For example, when Retallick moved to withdraw, the trial judge warned Pedockie that he would need to either accept Retallick's advice, represent himself, or get his own attorney. But after Pedockie fired Retallick, the trial judge ordered a continuance, stating that "you're entitled to have an attorney represent you, and, obviously, Mr. Brass . . . hasn't had enough time to get ready."

¶ 49 When Brass withdrew, the trial judge continued to scold Pedockie for prior delays and maintain that Pedockie would need to hire a private attorney or proceed pro se. Nevertheless, at the July 31 hearing, the trial judge agreed to "appoint the public defender's office for the third time" and gave every indication that the PDA attorney would act as primary, rather than standby, counsel. Pedockie relied on this statement when he failed to retain private counsel and appeared at the August 13 hearing expecting representation by the PDA. He was thus understandably confused when the judge insisted that the PDA attorney's role was limited to that of standby counsel. It is particularly troubling that, after agreeing to appoint counsel on July 31, the trial judge never warned Pedockie of the conduct that would give rise to an implied waiver of his right to appointed counsel but nevertheless imposed such a waiver sometime between the July 31 and August 13 hearings when Pedockie does not appear to have engaged in any objectionable conduct. Because any uncertainty over an alleged waiver of the right to counsel must be resolved in favor of an accused, we are unable to find a voluntary waiver under these circumstances.

¶ 50 Finally, even if Pedockie had voluntarily waived his right to counsel, our de novo review of the record fails to establish that any implied waiver was knowing and intelligent. There is nothing in the record to

---

49. *Id.*

50. *See Hassan,* 2004 UT 99, ¶ 22, 108 P.3d 695; *Arguelles,* 2003 UT 1, ¶ 70, 63 P.3d 731; *State v. Frampton,* 737 P.2d 183, 188 (Utah 1987).

51. *Hassan,* 2004 UT 99, ¶ 22, 108 P.3d 695.

52. *Frampton,* 737 P.2d at 188.

53. *Id.*

indicate that, at the time of the alleged waiver, Pedockie appreciated "the consequences of the decision to represent himself, including the expectation that [he would need to] comply with technical rules and the recognition that presenting a defense is not just a matter of telling one's story."[54]

¶ 51 Although the record does contain evidence that Pedockie wanted his case to be tried by an attorney because he knew "nothing about the law" and was not familiar with the rules of the court, such general knowledge does not necessarily evidence an understanding of the technical requirements inherent in presenting one's case. While Pedockie arguably obtained some understanding of these technical requirements during the course of the proceedings, the record is devoid of evidence that Pedockie understood these requirements prior to the time of the alleged waiver. For instance, Pedockie was informed of the technical rules of the court when the judge appointed standby counsel and explained that standby counsel could help prepare jury instructions and cross-examine and subpoena witnesses for trial but would not argue Pedockie's motions. By this point, however, the trial judge had already ruled that Pedockie was not entitled to appointment of primary counsel. Therefore, any knowledge that Pedockie may have had regarding the dangers and disadvantages of self-representation was too little, too late.

## CONCLUSION

¶ 52 We agree with the court of appeals that Pedockie is entitled to a new trial. We have reviewed the record and conclude that Pedockie did not voluntarily, knowingly, or intelligently waive his right to the assistance of counsel.

¶ 53 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.

---

**54.** *State v. Heaton,* 958 P.2d 911, 918 (Utah 1998).